IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| SPEECHLY BIRCHAM, LLP et al., <br><br> Plaintiffs, <br><br> v. <br><br> EKRAM J. MILLER, <br><br> Defendant. | Civil Action No. 8:10-cv-03041-AW |

**MEMORANDUM OPINION**

Plaintiffs Speechly Bircham, LLP, Michael Brindle, and Jeffrey Chapman bring this action against Defendant Ekram J. Miller. Plaintiffs each assert a breach of contract claim. Presently pending before the Court is Defendant's Motion for Summary Judgment. The Court has reviewed the entire record and finds a hearing unnecessary. For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment.

**I.  FACTUAL AND PROCEDURAL BACKGROUND**

On June 11, 2007, Swift Investment and Development Company, Ltd. ("SIDCO") initiated an arbitration request against Defendant Ekram J. Miller ("Miller") in his personal capacity and against his company, International Commerce Corporation ("ICC"). The arbitration proceedings were scheduled to be heard before the International Chamber of Commerce International Court of Arbitration in London, England.

The arbitration arose from alleged violations of the memorandum of agreement ("MOA") previously entered into between ICC and SIDCO. The MOA, inter alia, served as an instrument by which SIDCO and ICC where to form a third entity, Sky Gate, as a joint venture.

Defendant exercised total control over Sky Gate by virtue of being its president, director, and 50% shareholder in his individual capacity. Additionally, Miller acted as sole signatory over the accounts at Sky Gate. Miller's alleged use of shared funds under the MOA for personal purposes unrelated to Sky Gate's business was the central allegation underlying the international arbitration.

In August 2007, with the help of his American attorney, John E. Prominski, Jr. ("Prominski"), Miller filed an objection to arbitrability. Miller contended that arbitration was improper because he was not a party to the MOA in his personal capacity.

Miller sought additional representation for the overseas arbitration proceedings from the English law firm Speechly Bircham, LLP ("Speechly"). In February 2008, Speechly and Miller entered into a letter of agreement ("LOA" or "Agreement"). The LOA sets forth the essential terms of Speechly's representation of Miller in relation to the SIDCO dispute. In preparation for the SIDCO arbitration, Speechly retained the legal services of an English barrister named Jeffrey Chapman ("Chapman"). On July 23, 2008, Speechly successfully had Miller dismissed from the arbitration.

In the spring of 2009, Miller expressed interest in retaining additional counsel to assist Chapman in connection with the SIDCO arbitration. After a negotiation period, Miller, acting through Prominski, entered into an agreement by which Michael Brindle was to serve as lead counsel in the arbitration proceeding.[1]

---

[1] The appellation "English Barristers" refers to Chapman and Brindle together.

In October 2010, Plaintiffs filed their Complaint. The crux of Plaintiffs' Complaint is that Miller has failed to satisfy them for the legal services with which they provided him in connection with the international arbitration proceedings.

After discovery, Miller filed a Motion for Summary Judgment. Doc. No. 21. Miller maintains in this Motion that many of the fees that Plaintiffs seek to recover accrued after Speechly secured his dismissal from the international arbitration. Miller contends that ICC,[2] not he, is responsible for these fees.

Plaintiffs filed a lengthy response to Miller's Motion for Summary Judgment. Doc. No. 28-3. Plaintiffs make many multilayered arguments in their response. The thrust of Plaintiffs' response is that Miller and ICC jointly and severally bound themselves under the Agreement such that Miller may incur liability for the legal services Speechly rendered to ICC. Alternatively, Plaintiffs argue that Speechly still represented Miller's interests after his dismissal from arbitration and that Miller is obligated to compensate them for these services.

Miller replied in March of 2012, whereupon the Motion for Summary Judgment ripened. Miller's reply essentially restates the arguments Miller makes in his Motion for Summary Judgment.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate only "if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[2] ICC has filed for bankruptcy and gone out of business.

255 (1986)). To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Material disputes are those that "might affect the outcome of the suit under the governing law." *Id.*

Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his or her favor, the nonmoving party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *See Beal v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Further, if a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). Finally, hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment. *See Greensboro Prof'l Firefighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

### III. LEGAL ANALYSIS

Miller's Motion for Summary Judgment presents a handful of major issues. The Court considers each of these major issues in turn after briefly addressing choice of law issues.

#### A. Choice of Law

##### 1. *Speechly's Breach of Contract Claim*

"A federal court sitting in diversity must apply the choice-of-law rules from the forum state." *Chesapeake Bay Found., Inc. v. Weyerhaeuser Co.*, 848 F. Supp. 2d 570, 578 (D. Md. 2012) (citation and internal quotation marks omitted). "In deciding questions of interpretation

and validity of contract provisions, Maryland courts ordinarily should apply the law of the jurisdiction where the contract was made." *Id.* (citation and internal quotation marks omitted).

In this case, Speechly transmitted the LOA to Miller's business address in Rockville, Maryland. Miller subsequently executed it, thereby bringing the contract into existence. Although the record contains no direct evidence that Miller signed the Agreement in Rockville, Maryland, the available evidence lends itself to no other inference. Nor does Miller argue otherwise. Indeed, in relying exclusively on Maryland law to interpret the LOA, he implicitly so concedes. Plaintiffs agree with Miller's implicit concession. Accordingly, Maryland law applies to the interpretation of the LOA and any contract claims founded thereon.

        *2.*        *The English Barristers' Breach of Contract Claims*

Both Parties recognize that English law may apply to the interpretation of at least some aspects of the English Barristers' breach of contract claims. Given the intricacy of this issue, the Court defers considering it until it analyzes the viability of the English Barristers' breach of contract claims. This approach promotes both clarity and efficiency.

**B.**       **Miller's Liability to Speechly**

Miller presents three primary arguments to support his theory that he is entitled to summary judgment on Speechly's breach of contract claim. First, Miller asserts that he did not sign the Agreement in a personal capacity. Second, in a somewhat related fashion, Miller contends that he cannot be held personally responsible for fees that his corporation, ICC, incurred during the arbitration. Third, Miller maintains that, to the extent he is otherwise liable for Speechly's fees, he cannot be held liable for fees that accrued after he was dismissed from the arbitration proceedings.

Each of these arguments lacks merit. The first argument fails inasmuch as the Agreement expressly states that it is between Speechly and both Miller and ICC. Regarding the second argument, a reasonable juror could conclude that (1) the Agreement makes Miller jointly and severally liable for Speechly's fees and (2) the Agreement is a suretyship. Summary judgment with respect to the third argument is improper because (1) the Agreement is written broadly enough to cover fees that accrued after Miller's dismissal from the Arbitration (2) one can infer that Speechly was still representing Miller's interests despite his formal dismissal. In light of these considerations, the Court denies Miller's Motion for Summary Judgment as to Speechly's breach of contract claim.

    1.    *Whether Miller Signed the Agreement in a Personal Capacity*

Miller argues that he did not sign the Agreement in a personal capacity. Whether a party signs an agreement in an individual capacity or as a corporate representative is a question of law. *Ubom v. Suntrust Bank*, 17 A.3d 168, 172 (Md. Ct. Spec. App. 2011). Courts typically make this determination in accordance with the ordinary principles of contractual construction. *See id.* at 173–74 (citation omitted).

The ordinary principles of contractual interpretation in Maryland are well-established. The Court of Appeals of Maryland has "long adhered to the objective theory of contract interpretation." *Myers v. Kayhoe*, 892 A.2d 520, 526 (Md. 2006) (citing *Traylor v. Grafton*, 332 A.2d 651, 675 (1975)). "'A court construing an agreement under [the objective theory] must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (quoting *Dennis v. Fire & Police Emps. Ret. Sys.*, 890 A.2d 737, 747 (2006)). "[W]hen the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties

meant what they expressed." *Id.* (quoting *Dennis*, 890 A.2d at 747). In other words, "[a] court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean." *Maslow v. Vanguri*, 896 A.2d 408, 420 (Md. Ct. Spec. App. 2006) (citations omitted).

"'Only when the language of the contract is ambiguous will [courts] look to extraneous sources for the contract's meaning.'" *Ubom v. Suntrust Bank*, 17 A.3d 168, 173 (Md. Ct. Spec. App. 2011) (citation and internal quotation marks omitted). "Ambiguity will be found if, to a reasonable person, the language used is susceptible to more than one meaning, or it is of a doubtful meaning." *Id.* (citation omitted). "To determine whether a contract is susceptible to more than one meaning, the court considers 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of the execution.'" *Id.* (quoting *Phoenix Servs. Ltd. P'ship v. Johns Hopkins Hosp.*, 892 A.2d 1185, 1223 (2006)).

In this case, the LOA's plain language makes clear that the Parties intended for the LOA to bind Miller in a personal capacity. The first line of the Agreement states as follows: "Thank you for your instructions to represent Intercontinental Commerce Corporation ("ICC") **and yourself** in this matter." Doc. No. 29-1 at 2 (emphasis added). A few lines down, section 1.1 provides that Speechly "will represent **you and** ICC in relation to the dispute with SIDCO." *Id.* § 1.1 (emphasis added).

This language is susceptible to only the meaning that the LOA creates a contractual relationship between Miller and Speechly. Regarding the first line, the language "and yourself" would be superfluous were the Court to interpret the LOA as creating an agreement between only Speechly and ICC. Similarly, the term providing that Speechly "will represent you and ICC" amounts to mere surplusage if the Agreement created a contractual relationship between

only Speechly and ICC. This result would be inconsistent with the canon of contractual interpretation that courts must construe contracts in a way to avoid rendering their material terms superfluous. *See, e.g.*, *State Highway Admin. v. David Bramble, Inc.*, 717 A.2d 943, 948 (Md. 1998).

The LOA contains other language compelling the conclusion that Miller signed the letter in both a personal and corporate capacity. The LOA states that its purpose is to "provide **you** with details of the terms of engagement under which we have agreed to represent **you**." Doc. No. 29-1 at 2 (emphases added). Indeed, the LOA refers to the client as "you" throughout. *See generally id.* These repeated uses of "you" parallel the use of "you" and "yourself" in the two provisions discussed above, both of which referred to Miller in contradistinction with ICC. Furthermore, it is well-established that contractual terms should be given the same meaning throughout the contract. *See, e.g.*, *Jeffrey Sneider-Maryland, Inc. v. LaVay*, 345 A.2d 79, 83 (Md. Ct. Spec. App. 1975) (citing *O'Brien v. Miller*, 168 U.S. 287 (1897)).

Miller's primary counterargument is devoid of merit. Miller observes that, at the beginning of the Agreement, Speechly addresses it to "E.J. Miller, Esq., Intercontinental Commerce Corporation." Based on this sole observation—that E.J. "Miller, Esq., Intercontinental Commerce Corporation" is the LOA's addressee—Miller concludes that the LOA binds him in only a corporate capacity.

This argument is flawed in several respects. First, the LOA explicitly defines "you" as "the addressee of the [LOA]." Doc. No. 29-1 § 12.3, at 10. As used in the LOA, the word "you" refers to Miller in his personal capacity. Therefore, "the address of the [LOA]" is Miller personally, not ICC.

Furthermore, it is obvious that one would expect a person who enters into an agreement in a personal capacity to list his business address for informational or mailing purposes, not to convey that he intends to bind himself in only a corporate capacity. Miller's argument is akin to saying that an employee's mere act of buying something online and having it delivered to his place of employment proves that he made the purchase in a professional, not a personal, capacity.

To manifest such an intention, one would have more reasonably expected Miller to *sign*—not merely *address*—the Agreement in a manner purporting to show his intention to bind himself in only a corporate capacity, such as by listing his corporate title under his signature. However, as the Agreement unmistakably manifests, Miller failed to do so. *See* Doc. No. 29-1 at 6. Yet, even had Miller inked the LOA in this manner, it likely would have been insufficient, per se, to demonstrate that Miller signed it in a personal rather than a corporate capacity. *See, e.g.*, *Ubom*, 17 A.3d at 175 (citations omitted).

Miller's argument suffers from another defect. Extrapolated to its logical extremity, it would absolve Miller of liability to Speechly even though Speechly unquestionably represented him in connection with the SIDCO arbitration. This outcome would be anomalous and would render vast chunks of the LOA pointless.

For these reasons, the Court denies Miller's Motion for Summary Judgment as to the argument that the LOA binds him in only a corporate capacity. As a matter of law, the LOA binds Miller personally.

   *2.     Whether Miller Is Personally Responsible for Fees that ICC Incurred During the
   Arbitration*

Miller argues that, even if the LOA binds him in a personal capacity, it does not obligate him to pay for the legal services Speechly provided to ICC. This is because, in Miller's view, the LOA contains no term expressly requiring him to do so. Speechly counters that, although the LOA creates no such term, one can infer such an obligation therefrom. Alternatively, Speechly contends that one can reasonably construe the LOA as a surety contract by which Miller is obligated to satisfy ICC's unpaid debts to Speechly.

Genuine disputes of material fact exist concerning the scope of the LOA and whether it renders Speechly and Miller jointly and severally liable for each other's debts to Speechly. At the outset, the LOA states as follows: "Thank you for **your Instructions** to represent **[ICC] and yourself** in this matter." Doc. No. 29-1 at 2 (emphasis added). The LOA also provides that Speechly "will represent **[Miller] and ICC** in relation to the dispute with SIDCO." *Id.* § 1.1 (emphasis added).

These provisions support the inference that Miller instructed Speechly that he wanted it to represent both him and ICC in the arbitration, and that Speechly complied with this instruction. Under this case's facts (e.g., as president of ICC), Miller also likely enjoyed both actual and apparent authority to create a contractual obligation on behalf of ICC. *Cf. Atholwood Dev. Co. v. Houston*, 19 A.2d 706, 708 (Md. 1941) (citing authority); *Tobacco Tech., Inc. v. Taiga Intern. N.V.*, 626 F. Supp. 2d 537, 547 (D. Md. 2009) (citing authority).

Yet Miller made no effort to limit his personal exposure on the contract, such as by attempting to sign in only an official capacity. Instead, he simply affixed his naked signature to

10

the document. Accordingly, a reasonable juror could conclude that Miller jointly and severally assumed liability for Speechly's services to ICC.

To be sure, it behooves the Court to consider extrinsic evidence given the Agreement's ambiguity on this point. But Miller has adduced no extrinsic evidence entitling him to summary judgment. For instance, Miller's main counterargument is that Speechly submitted its invoices in the name of ICC, not Miller. This argument appears to be a rehash of the argument that the LOA does not bind Miller personally because he used ICC's address for identification and mailing purposes. The Court already rejected this argument and need not revisit it here. Furthermore, no matter the address to which Speechly sent the invoices, the record evidence indicates that Miller paid most of Speechly's invoices from a Sky Gate, not ICC, account. Because Miller basically held total control over Sky Gate, this fact may support the inference that Miller, not ICC, was paying for ICC's legal fees. Hence, what little extrinsic evidence Miller highlights fails to buttress his theory that a reasonable juror could only conclude that the Agreement fails to render him personally liable for Speechly's services to ICC.

A reasonable juror could also interpret the LOA as a surety agreement. "A contract of suretyship is a tripartite agreement among a principal obligor, his obligee, and a surety." *Gen. Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1309 (Md. 1985). "This contract is a direct and original undertaking under which the surety is primarily or jointly liable with the principal obligor." *Id.* (citing *Gen. Builders Supply Co. v. MacArthur*, 179 A.2d 868, 871–72 (1962)). Therefore, the surety "is responsible at once if the principal obligor fails to perform." *Id.* "Whether a party has entered into a contract of suretyship . . . is to be determined by the substance of the agreement and not by its nomenclature." *Id.* at 1311 (citation omitted).

In this case, for the foregoing reasons, a reasonable juror could conclude that the LOA created a tripartite agreement between Speechly, ICC, and Miller by which Miller agreed to assume responsibility for ICC's obligations if ICC failed to honor them. Although the Parties do not denominate the Agreement as a suretyship, its nomenclature is not dispositive. The Agreement unquestionably creates a contractual relationship between Speechly and both Miller and ICC. The Agreement even contains language from which one can infer that Miller directed such joint representation. Furthermore, fully apprised of his status as ICC's president, Miller executed the Agreement. Yet Miller left no indicia that he signed the Agreement in solely a corporate capacity. Nor does the Agreement otherwise indicate that ICC and Miller are to incur separate liability for Speechly's services. Therefore, construing the evidence most favorable to Speechly, a reasonable juror could conclude that the LOA made Miller a surety for ICC.

      *3.*     *Whether Miller is Liable for Fees that Accrued After his Dismissal from the Arbitration*

Miller argues that he cannot incur liability for legal services rendered after his dismissal from the arbitration. This argument suffers from an initial infirmity. The Court held in the preceding section that a reasonable juror could conclude that the LOA exposes Miller to personal liability for Speechly's legal services to ICC. Therefore, assuming that at least some of these services were for ICC, a reasonable juror could conclude that Miller is responsible for these services no matter the point in time at which the accrued.

Thus, the issue is what proportion of the post-dismissal legal services pertained to ICC. If they all did, then there is nothing to analyze. That is, the Court would have no need to assess whether Miller could incur liability for the post-dismissal services Speechly provided to ICC inasmuch as this conclusion would follow from the Court's preceding analysis.

Miller appears to concede that all of the fees that accrued after his dismissal related to Speechly's continued representation of ICC. He states: "It appears clear that all of the Fees were incurred after Miller was dismissed from the Arbitration in July 2008. . . . [All the fees] were incurred in respect of plaintiffs' representation of ICC." Doc. No. 22 at 6; *see also* Doc. No. 30 at 3–4 ("The fees here in dispute—incurred long after Miller's dismissal from the arbitration—appear to be related solely to plaintiffs' representation of ICC.").

In this regard, Speechly's views largely correspond to Miller's. On the one hand, Speechly argues that the Agreement personally obligates Miller to pay for services Speechly rendered to ICC irrespective of the stage at which Speechly rendered them. *See* Doc. No. 28-3 at 20–22. In the alternative, Speechly argues that a reasonable juror could conclude that Miller was the direct and personal recipient of at least some of the services Speechly provided after his dismissal from the arbitration. *See id.* at 22–25.

In light of these considerations, a reasonable juror could conclude that Miller is personally responsible for fees incurred after his dismissal from the arbitration. Miller insists that Speechly provided the services for the post-arbitration period solely for the benefit of ICC. Speechly does not truly dispute this contention, raising the argument that it furnished some of the post-arbitration services to Miller in a personal capacity only in the alternative. As held above, a reasonable juror could conclude that the LOA personally requires Miller to reimburse Speechly for services rendered to ICC. The Court also concluded that a reasonable juror could regard the LOA as a surety contract. It forcibly follows that a reasonable juror could conclude that Miller is responsible for the legal fees that accrued after Miller's dismissal from the arbitration.

Furthermore, insofar as Speechly provided some of the post-arbitration services to Miller only personally, a reasonable juror could still conclude that Miller is responsible for these

services despite their post-dismissal accrual. The LOA is written broadly. It does not necessarily limit the scope of Speechly's representation of Miller to arbitration proceedings in which Miller is a formal party.

Under the heading "Scope of our work," the Agreement provides that Speechly would represent Miller and ICC "in relation to" the dispute with SIDCO. Doc. No. 29-1 § 1, at 2. The Agreement then states that Speechly would provide the following services as a part of its representation of Miller in relation to the dispute with SIDCO: (1) "dealing with all necessary matters, as required, to represent you in the proceedings before the International Court of Arbitration"; and (2) "advising on procedure, tactics and other similar matters and dealing with evidence and other issues, as required." *Id.* § 1.2.

The language "in relation to" the dispute with SIDCO is sufficiently expansive to encompass services that Speechly provided after Miller's dismissal. Furthermore, in detailing the services that Speechly was to provide, the Agreement does not restrict the services to "all necessary matters, as required, to represent you in the proceedings before the International Court of Arbitration." Rather, it specifies that the services include "advising on procedure, tactics and **other similar matters** and dealing with evidence and **other issues**, as required." *Id.* § 1.2 (emphasis added).

Speechly argues in detail that the issues that the parties litigated in the SIDCO dispute after Miller's dismissal come within the scope of this language. Speechly essentially asserts that Miller's alleged misuse of Sky Gate funds raised, inter alia, the specter of criminal liability under the Office of Foreign Affairs Control ("OFAC") Iranian Transactions Regulations. *See* 31 C.F.R. §§ 560.101 *et seq.* Speechly further asserts that Miller's dismissal from the arbitration failed to preclude the prospect of OFAC violations and that, in representing ICC after Miller's

dismissal, Speechly continued to protect Miller's interests. Miller has offered no real response to these arguments. The Court finds persuasive Speechly's arguments concerning its continued representation of Miller's interests despite his formal dismissal. At a minimum, they suffice to create a triable issue on whether, pursuant to the LOA, Speechly represented Miller's personal interests in relation to the SIDCO arbitration after his dismissal. In sum, even if Speechly rendered some of its post-arbitration services to Miller per se, this fact would not preclude a reasonable juror from concluding that Miller agreed to pay for such services under the LOA.

For the foregoing reasons, the Court denies Miller's Motion for Summary Judgment as to Speechly's breach of contract claim.

**C.     Miller's Liability to the English Barristers**

Miller argues that he lacks personal liability to Brindle or Chapman and, therefore, is entitled to summary judgment on each of their claims. As to Brindle's breach of contract claim, Miller argues that (1) the disputed fees relate only to Speechly's representation of ICC and (2) no contract existed between him and Brindle. Both of these arguments fail as a matter of law.

Concerning Chapman's claim, Miller argues that he lacks contractual privity with Chapman under the LOA and that, for this reason, Chapman must seek any allegedly unpaid fees from Speechly. Alternatively, Miller contends that special rules of English law preclude Chapman from recovering attorney fees directly from him. Both of these arguments have merit and, accordingly, the Court will grant Miller's Motion for Summary Judgment as to Chapman's breach of contract claim.

*1.     Miller's Liability to Brindle*

Miller's argument that he is not personally liable to Brindle proceeds primarily from the premise that "[t]he fees here in dispute . . . appear to be related solely to plaintiffs' representation

of ICC." Doc. No. 30 at 3–4. The problem with this premise, as explained earlier, is that Miller may be liable for the fees in dispute even if they relate solely to plaintiffs' representation of ICC. Therefore—in relation to both Brindle and Chapman—this argument lacks merit.

Miller also argues that the Agreement does not create a written contract between him and Brindle. This argument misses the point. Brindle bases his contract claim on a series of emails that, in Brindle's view, culminated in a contractual relationship. *See* Doc. No. 29-7. The Court has scrutinized these communications and is satisfied that they serve as a basis for a reasonable juror to conclude that Miller entered into a contract with Brindle for the provision of legal services in connection with the arbitration.

In fact, a contrary conclusion would fail as a matter of law. On May 3, 2009, Miller instructs Chapman to find a QC[3] to assist Chapman in the arbitration proceedings. *Id.* at 2. On May 15, 2009, Jonathan Rosshandler (a partner for Speechly) notifies Prominski (Miller's counsel) that Brindle would be the best choice as QC. *Id.* at 6. On the same day, Prominski states that Brindle's qualifications are excellent and that he preferred Brindle over the alternative. *Id.* Hereupon, a contract between Miller and Brindle formed.

Unsurprisingly, then, the record contains other evidence from which one can infer a contractual relationship between Miller and Brindle. For instance, in one communication, Miller states that he "trust[s] Mr. Brindle and Mr. Chapman and will pay for their services and their time and to defend this case." Doc. No. 29-28 at 2. The record contains numerous similar communications in which Miller (1) acknowledges that the English Barristers have provided him with legal representation; (2) acknowledges that he has paid them for such representation; and/or (3) promises to further compensate them for such services. *See* Doc. Nos. 29-18 ¶¶ 6–7, at 2–3;

---

[3] QC stands for "Queen's Counsel." It generally denotes a barrister of exceptional ability who has been chosen as lead counsel after a rigorous selection process.

Doc. No. 29-26; Doc. No. 29-27 at 3; Doc. No. 29-29. Accordingly, a reasonable juror could conclude that Brindle had a contract with Miller. Indeed, the record evidence compels this conclusion.

Miller also argues that he has no liability to Brindle and Chapman because English law prohibits barristers from suing their clients for legal fees. In Miller's estimation, a barrister must "look[] to his instructing solicitors for payment of his fees, who will in turn treat them as a disbursement on behalf of the client, and recover them from the client under the solicitor's own contract with his client . . . ." Doc. No. 21-2 ¶ 14, at 6–7.

As against Brindle, this argument fails because the contract between Brindle and Miller was made when Prominski sent the May 15, 2009 email. The email states that it was sent from Prominski's work email account at the law firm Miles & Stockbridge. *See* Doc. No. 29-7 at 6. As a matter of record, Prominski's Miles & Stockbridge office is located in Virginia.

As stated in the choice of law section, "[a] federal court sitting in diversity must apply the choice-of-law rules from the forum state." *Weyerhaeuser*, 848 F. Supp. 2d at 578 (citation and internal quotation marks omitted). "In deciding questions of interpretation and validity of contract provisions, Maryland courts ordinarily should apply the law of the jurisdiction where the contract was made." *Id.* (citation and internal quotation marks omitted). In accordance with these principles, Virginia law applies to the contract between Miller and Brindle. Therefore, English law's general prohibition on barristers from suing their clients for legal fees is inapplicable. As a consequence, the Court denies Miller's Motion for Summary Judgment as to Brindle's breach of contract claim.[4]

---

[4] The Court is aware that this analysis effectively entitles Brindle to judgment as a matter of law with respect to his breach of contract claim, leaving the quantum of damages the primary issue left to ascertain. The Court invites Brindle—and only Brindle—to submit a supplemental summary judgment brief on this issue in which, inter alia, he **particularizes** his alleged damages. If Brindle chooses this course of action,

17

*2.	Miller's Liability to Chapman*

The story is somewhat more sophisticated for Chapman. The Parties agree that Speechly engaged Chapman to represent Miller and ICC as a barrister in connection with the arbitration proceedings. *See* Doc. No. 22 at 3; Doc. No. 28-3 at 6. However, the LOA does not explicitly authorize this engagement. Speechly does not appear to argue that it does. Instead, Speechly relies on a handful of email communications in which Miller states that he has compensated Chapman for his services and promises to pay him more to prove that a contract for the payment of Chapman's legal fees existed between Chapman and Miller.

As a consequence of the circuitous way in which the Parties have presented this issue, the Court must address the appropriate outcome in two binary scenarios: (1) the LOA implicitly authorizes Speechly's retention of Chapman; and (2) the LOA fails to authorize Speechly's retention of Chapman.

In scenario (1), Chapman would have no direct claim against Miller. Even if the LOA implicitly authorized Speechly's retention of Chapman, the LOA would not be between Miller and Chapman, but rather, Miller and Speechly. To be sure, Speechly could sue Miller for the cost of retaining Chapman. However, no direct claim against Chapman would lie. Perhaps for these reasons, Chapman does not argue that his contractual relationship with Miller arises from the LOA.

---

he must submit said summary judgment brief within **twenty-one (21) days** of the date of this Opinion. Said brief shall be not exceed fifteen (15) pages in length. If Brindle files said supplemental motion, Miller may respond to the same within fourteen (14) days of its filing. Said response shall not exceed fifteen (15) pages in length. If Miller submits said response, Brindle may reply within fourteen (14) days of the filing of the same. [footnote continued on next page]
Said reply brief shall not exceed ten (10) pages in length. As this supplemental briefing on Miller's breach of contract claim may not fully resolve all aspects of Brindle's claim, the Court will set the claim in for trial in the meantime.

Scenario (2) is comparably complicated. Plaintiffs seem to concede that Speechly engaged Chapman to represent Miller and ICC as a barrister in connection with the arbitration proceedings. *See* Doc. No. 22 at 3; Doc. No. 28-3 at 6. As this retention occurred in England, English law would likely apply to Chapman's claim against Miller for unpaid legal fees.

Miller argues that, under English law, Chapman must look to Speechly for his legal fees. *See* Doc. No. 21-2 ¶ 14, at 6–7. Speechly, in turn, would have to recover them under its own contract with Miller. *See id.*

Although Chapman concedes that this is the "general rule" in England, *see* Doc. No. 28-3 at 26, he asserts that an exception exists for "international work under the Code of Conduct." *See id.* To support this assertion, Chapman cites a document titled "Annexe A—The International Practising Rules." Doc. No. 29-21.

By their plain letter, however, these Rules actually undercut Chapman's contention. Annexe A contains two definitions for international work, only one of which is relevant here. The relevant definition provides as follows:

1. International work means practice as a barrister:

   . . .

   (b) where the lay client carries on business or usually resides outside England provided that:

   (i) the instructions emanate from outside England and Wales; **and**

   (ii) the work does not involve the barrister in providing advocacy services.

*Id.* § 1, at 2 (emphasis added).

In this case, although the instructions may emanate from outside the UK, the work unquestionably involves Chapman's provision for advocacy services. Therefore, the exception on which Chapman relies is inapposite.

Additionally, Chapman spotlights evidence showing that Miller (1) acknowledges that Chapman has represented him; (2) acknowledges that he has paid Chapman for such representation; and/or (3) promises to further compensate Chapman for such services. *See* Doc. No. 29-26; Doc. No. 29-27 at 3; Doc. No. 29-29. Although Chapman's view of the record is accurate, it fails to alter the fact that English laws prohibits such a financial arrangement. As the Court must apply English law in scenario (2), these considerations are immaterial.

 In sum, Chapman's claim against Miller for legal expenses lacks viability. Even if Maryland law applies to the claim, Chapman lacks contractual privity with Miller. And, as explained, the outcome under English law is effectively equivalent. Therefore, no reasonable juror could rule in favor of Chapman on his breach of contract claim against Miller. Accordingly, the Court grants Miller's Motion for Summary Judgment as to Chapman's breach of contract claim.

In light of the preceding considerations, the Court (1) denies Miller's Motion for Summary as to Brindle's breach of contract claim and (2) grants the same as to Chapman's breach of contract claim.

## IV.     CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Miller's Motion for Summary Judgment. A separate Order follows.

|  September 20, 2012  |  /s/  |
|---|---|
|        Date | Alexander Williams, Jr.<br>United States District Judge |